# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

JOSEPH VALDEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

COX COMMUNICATIONS LAS VEGAS, INC., VIDEO INTERNET PHONE INSTALLS, INC., QUALITY COMMUNICATIONS, INC., SIERRA COMMUNICATIONS, CO.,

Defendants.

2:09-CV-01797-PMP-RJJ

**ORDER**

Before the Court for consideration is Defendant Cox Communications Las Vegas, Inc.'s fully briefed Motion for Summary Judgment on the Issue of Joint Employer Liability (Doc. #191). By this Motion, Defendant Cox renews its motion for summary judgment under the joint employer liability issue which was the subject of a prior Order of this Court (Doc. #133). The Court heard argument on the instant motion on November 22, 2011 (Doc. #305).

Count I of Plaintiff's Amended Complaint alleges a FLSA Claim against Defendant Cox. The FLSA requires employers to pay a minimum wage and overtime to employees who are employed in an enterprise engaged in commerce. 29 U.S.C. §§ 206, 207. An employer who violates these provisions is liable to the

affected employees for their unpaid wages and overtime compensation, as well as for an equal amount as liquidated damages. Id. § 216(b). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." Id. § 203(d).

Under the FLSA, two or more employers may employ a person jointly. Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983), abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 539 (1985); 29 C.F.R. § 791.2(a). Each joint employer is individually responsible for complying with the FLSA with respect to the entire employment. Bonnette, 704 F.2d at 1469 (citing 29 C.F.R. § 791.2(a)).

The Court applies an "economic reality" test to determine whether a joint employment relationship exists. Torres-Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997). Under this test, the Court considers all factors relevant to the particular situation to evaluate the economic reality of an alleged joint employment relationship. Id. Among the factors the Court considers are "'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records,'" collectively the Bonnette factors. Moreau v. Air France, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting Bonnette, 704 F.2d at 1470).

Because the Court must consider the totality of the circumstances, the inquiry is not limited to the Bonnette factors. Id. Other factors the Court considers include, but are not limited to:

> (1) whether the work was a specialty job on the production line; (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to

another without material changes; (3) whether the premises and equipment of the employer are used for the work, (considering the alleged employee's investment in equipment or materials required for his task, or his employment of helpers); (4) whether the employees had a business organization that could or did shift as a unit from one [worksite] to another; (5) whether the work was piecework and not work that required initiative, judgment or foresight; (6) whether the employee had an opportunity for profit or loss depending upon [the alleged employee's] managerial skill; (7) whether there was permanence [in] the working relationship; and (8) whether the service rendered is an integral part of the alleged employer's business.

Torres-Lopez, 111 F.3d at 639-40 (internal citations omitted); see also Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 72 (2d Cir. 2003) (listing similar factors).

        The test is not mechanical and these are not the only factors the Court should consider. Bonnette, 704 F.2d at 1470. Ultimately, the determination is "based upon the circumstances of the whole activity." Id. (quotation omitted). Both direct and indirect control may demonstrate joint employment. Torres-Lopez, 111 F.3d at 643.

        "[T]he concept of joint employment should be defined expansively under the FLSA." Torres-Lopez, 111 F.3d at 639. The economic reality test "is intended to expose outsourcing relationships that lack a substantial economic purpose." Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 689 (D. Md. 2010). However, "it is manifestly not intended to bring normal strategically oriented contracting schemes within the ambit of the FLSA." Id. (quotation omitted).

        Whether a party is an employer for purposes of the FLSA is a question of law for the Court. Torres at 638. To find no joint employment as a matter of law at the summary judgment stage, the Court "would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to

plaintiffs, defendants are still entitled to judgment as a matter of law." Zheng, 355 F.3d at 76. The Court may find no joint employment even if some factors weigh in favor of finding joint employment. Id.

### 1. The Bonette Factors

#### a. Power to Hire and Fire Employees

The evidence shows that each individual contractor decided which employees to hire and fire. (MSJ, Ex. A at 57-58.)  However, no contractor employee could receive a badge from Cox and work on a Cox project unless that employee met Cox's standards, which included a background check, a drug test, and a proficiency test. (MSJ, Ex. A at 64.)  The contractor performed the background check and drug test and reported to Cox that those two tests were performed satisfactorily. (MSJ, Ex. D at 69, 71.) The proficiency test was given on Cox's premises. (MSJ, Ex. A at 202.)

If Cox indicated an installer was not permitted to perform work on Cox projects, either prior to beginning work or at any time during the installer's employment, the contractor had a choice whether to retain that employee for other, non-Cox related work. However, practically speaking, if Cox decided an installer could not work on Cox projects, that meant termination for installers at VIP which obtained 100% of its work from Cox. (MSJ, Ex. D at 82.) Additionally, although Sierra did work for another company named Charter, that work was done only in Reno. (MSJ, Ex. H at 2-3.) Consequently, if Cox indicated an installer in Las Vegas could not do work for Cox, that meant de facto firing of the installer in Las Vegas, even if technically the contractor could choose to retain the employee. Many, but not all, Cox contractors have ceased business entirely after they lose the contract with Cox. (Sealed Exs., Ex. 1.)

Plaintiff also avers that Cox identified by name certain installers Cox thought were not performing well. (Opp'n, Ex. E at 4.) If Cox indicated displeasure with a particular installer, the contractor would terminate that person because contractors who

did not meet Cox's performance standards would be terminated by Cox. (Id.) However, Valdez does not state that Cox ordered a contractor to terminate any particular employee or that a contractor did so in response to such a command. Rather, Valdez avers that contractors would terminate an individual installer who Cox identified as a poor performer out of a need to keep Cox happy with the contractor. (Id.)

Plaintiff also contends Cox maintains a blacklist of installers who have filed FLSA claims against Cox, and that Cox does not permit contractors to hire these individuals. Plaintiff has no evidence supporting this allegation, and offers only a newspaper article in support of this contention, which is hearsay. Moreover, Cox employees have stated under oath there is no blacklist.

                b.     Supervise and Control Employee Work Schedules or Conditions of Payment

Cox provides each contractor with its work orders for the next work day. It is up to the contractor to decide which installer will service which customer, and what each installer's route will be for any particular day. The contractors, not Cox, train the installers.

Cox has presented evidence that Cox did not monitor individual installers through the TOA computer system, a web-based computer program through which Cox scheduled service to customers and doled out installation projects to contractors. (MSJ, Ex. K at 95.) Cox acknowledges it has the capability of daily monitoring, but contends it does not do so. (Id.) However, Plaintiff avers that Dennis Ruiz ("Ruiz"), Cox's contract coordinator in Las Vegas, did track the progress of every installation job and every installer throughout the course of each work day. (Opp'n, Ex. A at 8.) According to Plaintiff, if Ruiz was not satisfied with the progress of a particular job, he would call the contractor's manager and complain. (Id.) According to Plaintiff, when Plaintiff

was a Sierra manager, Ruiz would send emails to him throughout the work day regarding the "currently ongoing work of individual installers of Sierra and the progress or more typically the lack of progress those installers were making on completing their assigned jobs for the day." (Opp'n, Ex. E at 2-3.) Ruiz's emails were considered commands to which the contractor responded immediately and would send other personnel to assist with the install. (Id.)

Plaintiff avers that while he was a supervisor with Sierra, he attended meetings with Ruiz four times a week. (Opp'n, Ex. A at 6.) According to Plaintiff, at those meetings Cox first would meet with all contractors and advise which contractor were performing well and which were not. (Id.) Following the collective meetings, Ruiz would meet with each contractor's managers, at which Ruiz would "identify and discuss each contractor's individual installers who he had identified as being poor performers." (Id. at 7.) Contractors who kept employing such employees would not receive further work from Cox, and Cox's individual assessment of particular installers resulted in installers losing their jobs with the contractors. (Id.)

Valdez also avers that installers were expected to make sales for Cox, and if they did not do so they would not last long in their jobs. (Opp'n, Ex. J at 5.) According to Valdez, Cox monitored contractors for sales numbers, and if the contractor did not make sufficient sales, it lost its contract with Cox. (Id.) According to Valdez, "[a]n installer who made no sales or very few sales for Cox would not keep their job for very long." (Id.)

Cox scheduled the installations with the customer. (Opp'n, Ex. A at 9.) The contractors had no choice about when to schedule installations. (Id.)

By contract, Cox requires contractor employees comply with Cox's Code of Excellence, which applies to Cox employees. (Opp'n, Ex. F at 14; Sealed Exs., Ex. 2.) Cox does not discipline the contractor employees directly. However, Cox complains

-6-

to the contractors if a customer calls Cox to complain. According to Plaintiff, Cox also evaluates each contractor on a weekly basis, and comments on the performance of individual installers.

### c. Rate and Method of Payment

Cox does not control the method of payment to contractor employees. Cox paid different rates to each contractor, and each contractor in this case paid different rates to their installers. There is no evidence Cox dictated any particular rate or pay structure to any contractor.

### d. Maintain Employment Records

Each contractor maintains employment records on the installers. The only potential employment record Cox maintains is a database which contains the installers' name and other identifying information which is gathered as part of the badging process. Cox has declined to turn over this database, and in recent Orders, this Court has sustained their objections to doing so.

## 2. Other Factors

### a. Integral Part of Business

Plaintiff attempts to analogize installation work to the deboning workers in a slaughterhouse in <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722 (1947). The Court finds this an imperfect analogy. This factor makes the most sense in integrated operations, like work on an assembly line. In <u>Rutherford</u>, the workers' tasks were part of a "series of interdependent steps." 331 U.S. at 725-26. That is not the case with the cable installations. Each installation is a series of tasks unrelated to any other project or process, all performed by the installer at a single location. An installation is not part of other, interdependent tasks performed by Cox employees.

### b. Responsibility Under Contracts Between Contractor and Employer Pass from One Contractor to Another Without Material Changes

1    Cox offers the contracts to contractors on a non-negotiable take it or leave it basis. (Opp'n, Ex. C Kennedy Dep. at 64.) Pursuant to the contract, work is performed only on an as needed basis in Cox's sole discretion. (Opp'n, Ex. F at 3.) The contract does not guarantee to the contractor any particular quantity or frequency of work. (Id.) Cox may terminate the agreement on fourteen days notice without cause. (Id. at 7.)

However, Cox presented evidence it does not pay the same rates to every contractor. Although there may be some movement among installers when a contractor loses its contract, that may be more indicative of a worker looking for a job within his skill set than a lack of material change in contractors. To compare to Rutherford, there the employer kept changing the identity of the individual contractor who hired the boning employees. But the same terms applied and the same employees continued to provide the same work in the same location on the employer's premises.

### c. Premises and Equipment

The only time installers are on Cox's premises is for the proficiency test and badging. Thereafter, the installer obtains work orders and equipment from the contractor and returns to the contractor to close out jobs and equipment. The contractor provides the employee with a uniform, although Cox provides the badge identifying the installer as working for a contractor for Cox.

Plaintiff argues the customer's home is Cox's premises because the contractor is there only because allowed to be by Cox. Plaintiff likens this to leased premises. However, customer homes are not Cox premises. Cox does not own or lease such premises.

Cox does not provide installers with equipment other than basic parts used for the install. The installer or contractor provides the necessary tools and vehicle.

### d. Employee Business Organization

According to Plaintiff, Cox installers move from contractor to contractor. (Opp'n, Ex. J at 4.) Plaintiff gives the specific example of Defendant VIP's owners,

who previously had worked for another Cox contractor that lost its Cox contract. (Id. at 4-5.) These individuals formed VIP and hired approximately half of the installers who worked for the company that went out of business. (Id.) Contractors who lose their contract with Cox do not tend to stay in business in Las Vegas. Of the 19 contractors Cox used, only 8 are currently still have active corporate status, while 10 have permanently revoked, withdrawn, or dissolved their corporate status in Nevada. (Sealed Exs. (Doc. #205), Ex. 1.) However, in this case, Sierra and VIP remained in business even after Cox revoked their contracts. Further, installers did not simply shift automatically to the new contractor. Rather, installers, including Plaintiff, had to apply for a job at each company.

### e. Skill Level

Cox describes installers as skilled workers. Cox required workers to pass a proficiency exam to perform installations for Cox. Plaintiff avers Cox installers "need not be particularly skilled or have the sort of experience possessed by journeymen electricians." (Opp'n, Ex. J at 3.) Contractors hire trainers whom they train for approximately 30 days before they are sent out on their own, even if they have no prior experience. (Id.)

### f. Opportunity for Profit or Loss from Managerial Skill

The quantity, quality, and schedule of work for each contractor is set by Cox. However, Cox argues the individual employee had the opportunity for profit within these parameters based on avoiding chargebacks, which basically were deductions from a quality bonus under the contract for any tasks left unperformed or which were done improperly. Cox also argues there was room for advancement within each contractor, as shown by Plaintiff's promotion to a supervisory position at Sierra.

///

///

          g.  Permanence in the Working Relationship

Plaintiff has presented evidence that installers at the various contractors in Las Vegas worked exclusively for Cox. If one contractor lost its contract, the installers could, and many would, either start their own contracting company or move to another contractor. However, Plaintiff has not presented evidence like that in Rutherford where the exact same employees continued to do the same work in the same location, and there really was just a name change of the contractor supervisor. Here, if a contractor lost its contract, any installer wishing to work on Cox projects had to apply to another contractor and would work on Cox projects only if Cox entered into an agreement with that contractor and assigned it work under that contract.

          h.  Other Factors

Plaintiff argues another factor the Court should consider is Cox's past history of similar FLSA violations. While such evidence may be relevant to show the contractors are sham economic entities designed to avoid FLSA liability for Cox, Plaintiff presents no probative issue on the point.

Defendants argue every case to address cable installers has found the cable company is not the installers' joint employer. See Jean-Louis, Doc. #275 (granting summary judgment of no joint employment for cable installers under similar facts); Jacobson, 740 F. Supp. 2d at 689-93 (same); Smilie v. Comcast Corp., 07-CV-3231 (N.D. Ill. Feb. 25, 2009) (unpublished) (same); Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1317-18 (S.D. Fla. 2001) (finding no joint employment at summary judgment where employee failed to show purported joint employer "checked the work on a daily basis, gave work commands or otherwise intervened in the performance of the installers' duties, on a daily basis or anytime"); Herman v. Mid-Atlantic Installation Servs., Inc., 164 F. Supp 2d 667 (D. Md. 2000) (granting summary judgment on issue of no joint employment for cable installers; however, installers in that case were

independent contractors for company which contracted with cable company); see also Zhao v. Bebe Stores, Inc., 247 F. Supp. 2d 1154, 1160-61 (C.D. Cal. 2003) (holding garment store was not joint employer where company that employed sewing employees was a going concern with its own facilities, equipment, employees, and supervisors; quality control did not amount to control or supervision of employees).  Although the details are sometimes different, every court to address this issue ultimately has found no joint employment for cable installers at the summary judgment stage under factual circumstances fairly similar to those before this Court.

In sum, the Court concludes that even when both the historical facts and relevant factors cited above are interpreted in the light most favorable to Plaintiff, Defendant Cox is still entitled to summary judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Defendant Cox Communications Las Vegas, Inc.'s Motion for Summary Judgment on the Issue of Joint Employer Liability (Doc. #191)  is **GRANTED**.

DATED: April 11, 2012.

_____
PHILIP M. PRO
United States District Judge